MARY RYAN v. ST. LOUIS TRANSIT COMPANY, Appellant.

Division Two, October 25, 1905.

1. **NEGLIGENCE: No Contractual Relations: Electric Wires.** The plaintiff's husband was employed by a company with which defendant had contracted to install an automatic oil system in its electric powerhouse in accordance with plans and specifications prescribed by defendant, and while working therein, with defendant's knowledge and consent, the wrench which he was using in his work of placing certain pipes came in contact with improperly insulated electric cables suspended overhead and made a "short circuit," and as a result he was instantly killed. *Held,* that, although there was no contractual relations between the deceased and defendant, the doctrine that it is not negligence to omit to take precautionary measures to prevent an injury which if taken would have prevented it, when the injury could not reasonably have been anticipated and would not except under exceptional circumstances have happened, is not ap-

plicable, but, on the contrary, electricty being of a highly danger-
ous character, it was the duty of defendant to use every protec-
tion which was accessible to insulate its cables at the point
where persons have a right to go, and to use the utmost care
to keep them so, and the fact that no contractual relations ex-
isted between defendant and deceased, will not prevent his wife
from recovering.

2. ———: **Implied Notice.** Knowledge of the character of insula-
tion of electric cables installed by defendant and exclusively
under its control, of the conditions under which that insulation
was maintained, and of the probable effect of heat on the safety
of the insulation, is chargeable to defendant. And the jury are
justified in inferring that it had knowledge that the insulation
had become soft and imperfect as a result of the action there-
on of heat maintained in the conduit where the cables were.

3. ———: **Insulated Wires: Anticipated Accident.** Where danger
of an electric shock was not imminent if the electric wires had
been properly insulated and maintained in proper condition, and
a reasonable man, whose employment brought him in close prox-
imity to them, may have safely felt that he could have under-
taken his work in their vicinity, the light there being too feeble
to enable him to discover their defectively insulated condition
but otherwise sufficient to enable him to perform the work im-
mediately in hand, the defendant cannot excuse itself for an
accident to him due to the defective insulation on the ground
that it sustained no contractual relation with him and was not,
therefore, required to anticipate the injury.

4. ———: ———: ———: **Contributory Negligence.** Nor was the
workman, under such circumstances, guilty of such contribu-
tory negligence in attempting to do his work under the condi-
tions as bars the right of his widow to recover for his death.

Appeal from St. Louis City Circuit Court.—*Hon.
Franklin Ferriss,* Judge.

AFFIRMED.

*Geo. W. Easley* with *Boyle, Priest & Lehmann* for
appellant.

The court erred in overruling defendant's demurrer
to plaintiff's evidence in chief. The strongest inference
that can be drawn from the whole of the plaintiff's evi-
dence is that some portion of the insulation had run

or dripped from the cable in consequence of the heat or temperature in the basement of the power house; that the plaintiff's husband, in some manner not explained by the evidence, allowed the wrench to rest upon the pipe and the other end of the wrench, by his act and that of his working companion, to come in contact with the cable by breaking through the insulation softened by the temperature of the basement, thus forming a circuit between the cable and pipe. It is indisputable that one of the deceased's hands rested on the wrench, and his companion, Madden, leaves the question in doubt as to whether the other hand of deceased rested upon the pipe or upon his knee. But it is indisputable that, if his hand rested upon his knee, there would have been no circuit of electricity passed through his body. One pole of the circuit would have been wanting. The tile conduit upon which he stood was a non-conductor. If, however, one of his hands rested on the pipe, both poles of the circuit would be present and the current would have passed through his body. "The injury could occur in only one way, . . . . namely, by his bare hand coming in contact with" the wrench which was then in contact with the wire, "and his other hand or part of his bare person coming into contact in the same instant with the iron" pipe, "so as to pass the electrical current through him. Could the defendant have reasonably anticipated, under these circumstances, the occurrence of an accident such as this? Ought the defendant to have foreseen it, in the light of attending circumstances? We think not. It clearly appears that the use of the wooden pole in climbing up or coming down was not dangerous, nor was it possible for the plaintiff, while climbing or clinging to it, to have received a shock even by touching the charged span wire, unless he completed the circuit, at the same instant, by touching the iron post with his naked hand or person. The defendant had no right to expect that

an inexperienced operative would have climbed to such a point, much less that an experienced and competent one, with his knowledge of the situation, at the only possible point of danger, with the warning of this circuit breaker before him, would practically eliminate it as a means of safety, and by placing his body substantially in its place, complete the electrical circuit, so that the current would necessarily pass through his body. It was not expected that he would have occasion to touch or come in contact with the span wire beyond the circuit break, or the iron post, for any purpose, and certainly not so as to complete an electrical circuit with his body." Huber v. LaCrosse, etc., 92 Wis. 363; Walters v. Railroad, 64 App. Div. 150; Am. Brew. Co. v. Talbot, 141 Mo. 683; Ray on Neg. of Imposed Duties, pp. 183, 184; Webb's Pollock on Torts (Enlarged Am. Ed.), pp. 45, 46; Fuchs v. St. Louis, 167 Mo. 645; 2 La. Batt's M. & S., secs. 364, 601, 810; 1 Kinkhead's Torts, sec. 316; Owings v. Oil Mill (S. C.), 33 S. E. 511.

*John S. Leahy* and *Block, Sullivan & Erd* for respondent.

(1) Appellant's negligence was amply proven. Geismann v. Electric Co., 173 Mo. 674. (2) Deceased was not guilty of contributory negligence in working where he did, because apparently there was no immediate danger, and apparently the work might, with care, be safely undertaken. Mathis v. Stock Yards Co., 185 Mo. 434; Wendler v. House Fur. Co., 165 Mo. 540; Hamman v. Coal Co., 156 Mo. 244; Young v. Oil Co., 185 Mo. 634. (3) The burden of proving that deceased was guilty of contributory negligence, in the manner of doing his work, rested with appellant. Baker v. Railroad, 122 Mo. 544; Williams v. Railroad, 109 Mo. 486; Young v. Iron Co., 103 Mo. 328. (4) Preliminary statements in the charge, if erroneous, furnish no

ground for reversal. Burton v. Trenton, 116 Mo. 371; Golden v. Clinton, 54 Mo. App. 116. (5) Deceased did not assume risks in his employment which were attributable to appellant's negligence. Curtis v. McNair, 173 Mo. 279; Chambers v. Chester, 172 Mo. 483. (6) If the accident is attributable to the joint negligence of appellant and deceased's helper, or employer, appellant is nevertheless liable. Newcomb v. Railroad, 169 Mo. 422.

GANTT, J.—This action was commenced July 19, 1901, against the St. Louis Transit Company and the Cullen & Stock Heating and Ventilating Company, to recover damages for the death of the plaintiff's husband. An amended petition was filed on the 10th of December, 1901, omitting all reference to the Cullen & Stock Heating and Ventilating Company, other than that the plaintiff's husband was a pipe-fitter in the employ of the Cullen & Stock Heating and Ventilating Company, which was under contract with the appellant to erect and place in position in its powerhouse on Tiffany avenue, between Vista and Park avenues, certain pipes for the conveyance of water through said building and to the engines and boilers therein. It is then alleged that on the 9th day of May, 1901, the plaintiff's husband, James P. Ryan, at the special instance and request and with the knowledge and consent of the defendant Transit Company, entered the said premises in order to perform the labor required of him in the construction and erection of said pipes; that said Ryan was required to and did get upon a certain conduit, and while on said conduit, and while exercising the care and caution in and about his work which should have been exercised by a reasonably careful person, and while handling and adjusting one of said iron pipes entering into the construction in which he was

then engaged, the said Ryan received through said pipe on which he was then working an electric shock, which then and there immediately caused his death.

The petition further alleges that adjacent and in close proximity to said iron pipes then being erected by said James P. Ryan, were certain cables or wires used by appellant for the purpose of distributing and equalizing the electricity between the switching boards in said building, and as a part of its appliance in generating and distributing electricity for the purpose of propelling its street cars; that said cables or wires were highly charged with electricity and were known to be so highly charged by the appellant, and that the said wires or cables so charged were exceedingly dangerous to life and limb, and were known to be thus dangerous by the defendant; that because of the dangerous character of said wires or cables when so charged with electricity, and for the purpose of rendering them less dangerous, said wires had been insulated, but plaintiff charges the fact to be that the insulation on said wires or cables was decayed, insufficient and inadequate to prevent the communication of electricity with which said wires or cables were charged, to other metallic substances coming in contact therewith; that the same were negligently and carelessly insulated in an improper manner, and had been permitted to become decayed, disintegrated and incapable of preventing the communication of electricity in said wires and cables to other metallic substances with which they might come in contact. That said wires or cables were negligently and carelessly strung along the ceiling of the basement of said building and immediately over the conduit aforesaid; that said wires or cables were supported or held to the ceiling of said basement at spaces aggregating five feet, and, by reason of the weight of said cables and the use to which they were put, the said wires sagged so that they hung from said ceiling at a point immediately

over said conduit at a distance of about two feet below the ceiling, instead of being securely and tautly held close to the ceiling. The insulation of said wires was composed of a material that, being stretched, would disintegrate, crumble and fall off, thereby destroying the protection which said insulation was intended to afford, whereby the wires proper were suffered to come in contact with other substances, or, because of the defectiveness and insufficiency of the insulation, the electricity contained therein could be and was communicated to other objects with which said wires or cables could be and were in contact, and the said wires had been for a long time maintained by the defendant in the condition and position aforesaid, that is, in a condition and position such as permitted the electricity to be easily communicated to other substances coming in contact therewith, and that the maintenance of said wires or cables in said condition and position was negligence. Plaintiff says that on said 11th day of May, 1901, by reason of the defective condition of said wires and cables aforesaid, the electricity contained therein was communicated to the pipe or piping then being erected, and in the erection of which the said James P. Ryan was then engaged, and that while he, the said James P. Ryan, was erecting the said pipe or piping, and while he, the said James P. Ryan, was exercising due caution, the electricity communicated from said wires or cables to and through said pipe or piping was communicated to the body of the said James P. Ryan with such force and violence as to cause his immediate death as aforesaid. Plaintiff says that it was the duty of the defendant to provide the said James P. Ryan a safe place in which to perform his labor; that the said pipe or piping was erected by said James P. Ryan at the point indicated and immediately over the said conduit by the command and direction of the defendant, and that it was the duty of the defendant to keep the said location

free of danger while he, the said James P. Ryan, was complying with the directions and commands of the defendant, but plaintiff says that the said place so furnished him to do the work aforesaid was not a safe place, but on the contrary, and by reason of the facts aforesaid, the same was a highly dangerous place, and because of the danger of the electricity contained in said wires or cables and the probability of the same being communicated to the pipes and piping upon which he, the said James P. Ryan, was then working because of the defective insulation resulting from the causes aforesaid, the defendant failed in its duty to keep and maintain the said location, where the said James P. Ryan was then working, free from danger, and that by reason of the failure of the defendant to furnish the deceased, James P. Ryan, a reasonably safe place in which to perform his labor and its failure to keep the same free from danger the said James P. Ryan was killed as aforesaid.

The answer was a general denial, with a plea of the assumption of the risk by the deceased, and the deceased's contributory negligence in the handling of the tools and piping which he was engaged in installing.

The reply was a general denial.

The facts developed on the trial were substantially as follows:

Cullen & Stock Heating & Ventilating Company contracted with appellant, the St. Louis Transit Company, to furnish materials and labor and install an automatic oiling system in appellant's powerhouse at Tiffany and Vista avenues, in St. Louis, upon plans and specifications prescribed by appellant, the St. Louis Transit Company. For this purpose, it was necessary to install in the basement room in the powerhouse, certain pipes suspended a short distance from the ceiling . by hangers. The plaintiff's husband was a steam-fitter by trade, and was employed by the said heating and

ventilating company to assist in this work, and was engaged for about three weeks in working on the premises in this connection. He and his helper, one Madden, installed the pipes referred to, and had put in three and were engaged in putting in the fourth when the accident occurred which cost him his life. The pipes ran parallel with each other, and a few inches apart. Above them were suspended a number of insulated wire cables, in use by appellant to transmit dynamic electricity to its overhead trolley wires in the streets, for the propulsion of its cars. These cables were constantly and highly charged with the electric fluid. They were suspended from the ceiling by hangers which were eleven feet and some inches apart, and which, according to the expert testimony in the case, were not close enough together; and between the hangers the cables had sagged downward. The experts said that the insulation of these cables was what was called weatherproof insulation, and not a proper kind of insulation to use in such a place as this basement, because this character of insulation was susceptible to heat, and the degree of heat which constantly prevailed in the basement was likely to cause this kind of insulation to soften and possibly to drip or run. In its normal condition, the insulation used could not be cracked, penetrated or broken so as to expose the live wires beneath it, without the exercise of considerable force; but if exposed to high temperature and softened, it might then be penetrated, broken or displaced, although subjected to no great degree of force. It might become softened by heat so as to be dangerous to handle, without that fact being apparent to the observation other than by actually touching the insulation. Plaintiff's husband was killed while putting in the pipe, in proximity to these cables, by the creation of what the experts call a short circuit, caused by contact between the wires of one of the cables and either the pipe upon which, or

the wrench, with which he was working. This, the experts said, could not have happened if the insulation had been in good condition, because these cables were entirely harmless unless some metallic substance was brought in actual contact with the wires themselves, which could not have happened without the exercise of considerable force if the insulation had been in good condition. All of the testimony showed that with the insulation in normal condition, these cables could be handled with impunity. The only metallic substances which Ryan was using or handling at the time, were the pipes which he was installing, and the wrench which he and his helper were using to do the work. The evidence on the part of the plaintiff tends to show that one of these two came in contact with the wires beneath the insulation of the cable, and thus caused the short circuit which produced the flames and shock, and resulted in Ryan's death. It is conceded that the evidence does not disclose positively which of the two made the contact. The parties were screwing the pipe into another by means of a wrench. Madden, the helper, who survived the accident, says his hand was between the wrench and the cable which was closest, and that at the time of the catastrophe, they had ceased to pull on the wrench, and Ryan was looking at the coupling of the pipe, while he himself was simply holding the wrench in position, and exercising no more force than was necessary for that purpose. The experts were of the opinion that contact between the live wires and the wrench alone would not have produced the phenomena which happened, unless the wrench was at the time in contact with the pipe; while contact between the pipe and the wire alone would have produced a short circuit. The wrench, the pipe and the cable were before the jury, and the experts, from the condition of the two former, were of the opinion that the pipe, and not the wrench, had made the contact. At the trial, the insulation upon

a portion of the cable, then in a normal condition of temperature and hardness, was hammered with a wrench without any effect. A portion of both the cable and the pipe were burned up in the contact at the time of the accident. It was further shown that the insulation on the cables at this place was soft and sticky at the time, although there was nothing to show that deceased knew that fact, or indeed, that he knew of the danger to which such a situation gave rise. The light in this basement was sufficient to enable the men to do the work they had set about, but not sufficient for one to make an examination of the insulation of these cables. Plaintiff's husband and Madden, his helper, attempted to light candles and a torch to furnish them more light to aid them in their work, but a strong draught prevented their doing it. The experts testified that owing to the excessive heat which constantly prevailed in this room, the proper kind of insulation to have used was either fireproof insulation, or fire and moisture-proof insulation, each of which is impervious to the action of such heat as prevailed there.

There was evidence also to the effect that the insulation might have been melted or softened by the excessive current of electricity passing through the cable as well as from the heat in the room. And that although the insulation had run and melted off, the outer covering of cloth would still remain, and that if the wire resting on the pipe had been perfectly insulated the contact would not have occurred.

The instructions given by the court will be noted and considered as far as necessary in the opinion of the court. The jury returned a verdict for the plaintiff for $4,666.66. In due time the defendant filed its motion for a new trial and in arrest of judgment, which were duly considered and overruled, and the defendant brings the case to this court by appeal.

I. The first, and, we may say, the main, conten-

tion for a reversal of the judgment is that the circuit court should have sustained a demurrer to the evidence, and this is based upon the ground that the defendant could not have reasonably anticipated the occurrence of such an accident as the one which caused the death of plaintiff's husband. It is practically conceded by the learned counsel for the defendant that the plaintiff's evidence justified the jury in finding that some portion of the insulation had run and dripped from the cable in consequence of the heat or temperature in the basement of the power house, and that the plaintiff's husband, in some manner not clearly explained by the evidence, allowed the wrench to rest upon the pipe, or the other end of the wrench by his act and that of his working companion to come in contact with the cable by breaking through the insulation thus softened by the temperature of the basement, and in this manner forming a circuit between the cable and the pipe. The tile conduit upon which he stood was a non-conductor. If one of his hands rested on the pipe and the other rested on the wrench, both poles of the circuit would be present and the current would have passed through his body. The insistence is that the negligence of the softening of the insulation would not have caused any injury to the deceased had he not caused the wrench to touch the wire and no harm would have followed touching the wire with the wrench if the deceased had not had his hand on the pipe at the same instant he had it upon the wrench, and the doctrine is invoked that it is not negligence not to take precautionary measures to prevent an injury, which if taken would have prevented it, when the injury could not reasonably have been anticipated, and would not, unless under exceptional circumstances, have happened. In determining the soundness of the proposition thus advanced by the appellant, it is essential to ascertain what duty the defendant owed to plaintiff's husband with reference to

its live wires in the circumstances of this case. It is to be noted that there were no contractual relations between the deceased husband of the plaintiff, and the defendant Transit Company, but it is undisputed that the deceased was upon the premises of the company with its knowledge and consent, and to do a work for which the company had contracted with the employer of the deceased. When the defendant company made its contract with the Cullen & Stock Heating & Ventilating Company to install the oil system in the defendant's powerhouse upon plans and specifications prescribed by itself, it knew and was bound to anticipate the necessity under which the Heating & Ventilating Company rested of sending its employees upon its premises for the purpose of installing the pipes upon which the deceased was working when he was killed, and hence the duty devolved upon the defendant of keeping the electrical wires, near which the deceased was required to work in the performance of his duty in installing the oil pipes, so insulated and protected as to be safe for the deceased to work in their vicinity. This doctrine, after a thorough consideration, was announced in Geismann v. Electric Company, 173 Mo. 654. In that case the wire that caused the injury belonged to a lighting company, and was suspended at the place of the accident upon private premises, although the latter did not belong to the owners of the wires. The deceased in that case went upon the premises to remove a sign which apparently belonged to a tenant, and in the course of his labors a wire with which the sign was suspended came in contact with a live wire, which produced the shock which resulted in his death, and the conclusion was announced that "electricity is one of the most dangerous agencies ever discovered by human science, and owing to that fact it was the duty of the electric light company to use every protection which was accessible to insulate its wires at the points where people have a right

to go, and to use the utmost care to keep them so; and for personal injuries to a person in a place where he has a right to be without negligence on his part contributing directly thereto, it is liable in damages." The rule thus announced in the Geismann case was followed and approved, after a review of the authorities, in Young v. Waters-Pierce Oil Company, 185 Mo. 634. The fact, then, that there was no direct contractual relation between the plaintiff's husband and the Transit Company will not prevent a recovery by the plaintiff in view of the highly dangerous character of the electric wires about which plaintiff's husband was required to work. As was said by the Supreme Court of New Jersey in Van Winkle v. American Steam-Boiler Insurance Company, 19 Atl. l. c. 475: "The law hedges around the lives and persons of men with much more care than it employs when guarding their property, so that, in this particular, it makes, in a way, every one his brother's keeper; and therefore it may be well doubted whether in any supposable case redress should be withheld from an innocent person who has sustained immediate damages by the neglect of another in doing an act, which, if carelessly done, threatens, in a high degree, one or more persons with death or great bodily harm." In view of these legal principles the insistence of counsel that the accident was one which the company could not have reasonably anticipated and therefore was not bound for its failure to keep its electric cables properly insulated, would seem to be without merit. It was agreed on all hands that the insulation on these cables was safe enough when normal, but was shown to be of a kind to be easily affected by the extraordinary temperature to which the Transit Company knowingly and continually subjected them, and knowledge of the character of the insulation installed by itself, of the conditions under which it was maintained, and of the probable effect of those conditions on the safety of the

insulation, must be chargeable to the defendant company. It knew, when it sent the plaintiff's husband to work about these cables, the kind of insulation it used, and being in the exclusive control of the basement, the jury was justified in inferring that it had a knowledge of the condition of the insulation, and that it had in fact become soft and imperfect. While it is true that the evidence does not disclose exactly how the accident was occasioned, it does. show that either the wrench or the pipe which the deceased was handling at the time of his death came in contact with the wires beneath the insulation of the cable. If the former, it was in its use in turning the pipe and owing to the softened condition of the insulation; if the latter, it was because the cable sagged and touched the pipe, and the pipe in turning displaced the safe insulation and thus touched the live wire. That neither could have happened if the insulation had been in a good condition is obvious and was conclusively proven by the testimony in the case. The evidence without any contradiction showed that these wires were safe to approach and handle when the insulation was in a proper condition, and while it is dangerous to a greater or less degree to approach live wires under any conditions, and the deceased was aware of this and even mentioned it to his companion, the evidence was clear that if the wires had been properly insulated and maintained in proper condition the danger was not imminent and a reasonable man would have felt that he could safely undertake to work in their vicinity.

This court in the Geismann case cited and adopted the language of the Supreme Court of Louisiana in Clements v. Electric Light Company, 44 La. Ann. 692: "Electric wires are disarmed of danger if properly insulated. By looking one can see if there are evidences of insulation. If there are evidences of it, and no defects are visible after careful inspection, one whose em-

ployment brings him in close proximity to the wire, and which he has to pass, either over or under it, is not guilty of contributory negligence by coming in contact with it, unless he does it unnecessarily and without proper precaution for his safety. The wires if properly insulated would have been harmless." In this case the wires had been insulated. The light in the basement was not sufficient to enable the deceased to inspect the insulation and the draught was so strong that he and his co-workman could not keep a candle or torch burning. There was sufficient light for them to do the work they were sent to do. They had every reason in these circumstances to assume that the wires were safely insulated, and that they could work about them without danger to themselves, and it must be held that the company in contracting for the work of installing the oil pipes anticipated, or in the exercise of ordinary care were bound to anticipate, that these workmen while in the course of their employment would touch or come in contact with these cables, and therefore the principal contention of the defendant, that it could not have reasonably anticipated the occurrence of such an accident as this, appears to us entirely untenable, but on the contrary the want of proper insulation of these cables was the proximate cause of the injury to plaintiff's husband.

As to the other proposition advanced in support of the demurrer to the evidence, to-wit, that plaintiff's husband was guilty of such contributory negligence as to bar a recovery, it is clear, we think, from the foregoing that deceased was not guilty of negligence in attempting to do his work under the conditions as they must have appeared to him as already detailed. There is no evidence whatever to support the claim that he was doing his work in a negligent manner. The presumption is that he was in the exercise of due care and the question of his contributory negligence was duly

submitted to the jury in the instructions given by the court.

II.   It is urged that the court erred in its instructions in behalf of the plaintiff.   These instructions were as follows:

''The plaintiff in this case sues the Transit Company to recover damages for the death of her husband, James P. Ryan, which occurred on the 11th day of May, 1901, as the result of an electric shock received by him while working in the basement of Power House No. 2 of the defendant.   The plaintiff claims that this electric shock was due to the fact that the insulation of the electric wires was improper, imperfect and impaired, and that their condition was due to the negligence of the defendant.   The defendant denies that there was any negligence on its part and asserts further that the accident was the result of the negligence of Ryan himself by reason of his failure to exercise due care in the performance of his work.   You have heard all the testimony in the case and the court instructs you as follows concerning the law:

''The deceased Ryan was lawfully on the premises of the defendant.   Although Ryan was working for an independent contractor and was not under the control of the defendant, still it was the duty of the defendant to exercise ordinary care and diligence to have the premises in reasonably safe condition.   By ordinary care and diligence is meant such care as persons of ordinary prudence would exercise under the same or similar conditions.   If the insulation on the electric wires in question was in an imperfect and dangerous condition, and if such condition was known to the defendant or could have been known by the exercise of reasonable care or inspection, and if Ryan received an electric shock by reason of such imperfect condition and it was without any negligence on his part, then plaintiff is entitled to recover a verdict.   The mere fact, however,

that the insulation was in an imperfect condition would not make the defendant liable unless the further fact appears to your satisfaction from the evidence that the defendant knew or could have known of such defective condition by the exercise of due and ordinary care and inspection.

"On the other hand you are instructed that defendant was not an insurer of the safety of plaintiff's husband and would not be liable for the mere fact that Ryan was killed from an electric shock on defendant's premises, nor would the defendant be required to use the most perfect kind of insulation, if that which was used was reasonably safe and proper under all the circumstances and facts in the case, and the defendant would not be liable if the death of Ryan resulted from accident without the fault or negligence of anybody.

"Plaintiff cannot recover in this case unless the evidence shows and until she has satisfied you, by the greater weight of the testimony, that the death of her husband was due to the negligence of the defendant as defined and explained in these instructions in permitting the insulation to be imperfect.

"You are further instructed that with regard to the question of contributory negligence which defendant sets up in his answer, if the accident to Ryan was the result of his own negligence and carelessness in working in a place which a reasonable person in his position would know to be dangerous, or of his negligence and carelessness as to the manner in which he performed his work, and that his carelessness and negligence directly contributed to the injury, then plaintiff is not entitled to recover. A workman has no right to work in a place which is obviously dangerous, and if he does so he takes the risks which are naturally incident to such a situation, but the mere fact that Ryan may have known that the place was dangerous would not in itself deprive the plaintiff of the right to recover, if in point of fact the

accident resulted from the negligence of the defendant, and if Ryan while working in proximity to the cables exercised such care and caution as a man of ordinary care and prudence in his calling would exercise under like circumstances; and although he may have known there was danger, yet if the danger was not such as to threaten immediate injury to him, or if he might have reasonably supposed that he could safely work in proximity to said wires by the use of care and caution, then he cannot be said to have been guilty of contributory negligence.'' '

The objection to these instructions seems to be that the instructions do not follow the allegations of the petition. We think the objections urged against these instructions are extremely hypercritical. Leaving out the preliminary statement of the court as to the respective claims of plaintiff and defendant, it is obvious that when the court came to charge the jury what facts would authorize the recovery by the plaintiff, it told the jury that the defendant was not required to use the most perfect form of insulation and that if that which the defendant was using at the time was reasonably safe and proper there could be no recovery, but if the insulation was in an imperfect and dangerous condition, and this condition was known to the defendant or could have been known by reasonable care and inspection, and if the deceased received an electric shock by reason of such imperfect condition without any negligence on his part, then the plaintiff was entitled to recover. The instruction was more favorable to the defendant than was authorized by the decision in the Geismann case, but of this the defendant is in no condition to take advantage, as the instruction was more favorable to it than it had a right to demand. The criticism on the instruction of contributory negligence, we think, is without any merit. The instruction taken as a whole and read all together was a fair and correct enunciation of

the doctrine of contributory negligence as applied to the facts of this case.

III.   Error is also assigned in the refusal of certain instructions prayed by the defendant.   We have carefully gone through each one of these requests and noted the objections of defendant's counsel, and without encumbering this opinion with a critical analysis of each of them we must content ourselves with saying, first, as to those which were applicable to the issues on trial, they were fully covered by those given by the plaintiff. The others had no relevancy to the case and were properly refused on that ground and could only have served to have misled the jury and turned their attention from the real facts of the case.

After full consideration of the record we find no reversible error and the judgment of the circuit court is affirmed.

*Burgess, P. J.,* and *Fox, J.,* concur.